May it please the Court, Star Jones on behalf of the Pelhams, Ms. Chen, Ms. Hill, and Ms. Clemmer. There are a multitude of issues in this case in front of you today, and I would like to briefly go over the issue regarding the District Court's dismissal of Ms. Clemmer's failure to promote claim. The appellees in this matter contend that we did not brief this in front of the Court today, and we argue that we did brief this. The District Court ruled that Ms. Clemmer did not present a genuine material that she required regarding her failure to promote claim as the assistant principal and the dean position that she applied for. And in the brief in front of you today, Ms. Clemmer contends that first, there is an unwritten policy, more or less, that a member of the leadership committee told her that at least three black people from every job are interviewed, but they will never get the job because they are part of a rotation of black folk. That was told to her by a member of the leadership committee with an ISD. Where specifically do you brief that claim? That is on, Your Honor, page 6 of our brief for the Clemmer brief. There are two separate briefs in this matter. This is the Clemmer brief, and that would lay the groundwork for Ms. Clemmer proving that the reason why she did not get either one of these jobs is because of the fact that she is black. Right, but where does it say that you're bringing the promotion claim? Because that seems to be headed up with a deprivation of property interest was caused by the violation of customer policy. I'm sorry, that's the page you referred to. Yes, Your Honor. Where do you argue? I'm trying to decide if they're correct or not. And I understand that, Your Honor. It was not actually put under a specific subheading within the brief. But where is the sentence that says, and the promotion was denied, and that's a violation of law because of... Well, Your Honor, that was just laying the groundwork. But on page 11, she actually talks about all the different jobs that she applied for but she did not get. Specifically, she talks about how she applied for an assistant principal job at Crockett Middle School, where she was interviewed by Ramey Ramsey, a Caucasian woman, and Ramey Ramsey actually ended up getting the job. Where do you lay out the standard of review for this type of claim and the case law that's applicable and analyze this claim? Your Honor, within this brief, we actually did not lay out the law on that matter. It's a fact issue that the district court ruled that we did not present any genuine issue of fact. And we contend that we did, and to the district court, we did lay out the case law on that. And in the brief here, the facts are throughout the brief. Well, speaking of your brief, I'm very concerned because your brief at page 29 says, she is not the person who says, however, comma, she is not the person who filed or signed her charge. Well, and they say that there was a signed charge in their brief, so I pulled the charge, and it appears that maybe it's someone else's signature. You can't quite tell, but it looks like it's her signature from the other copies of the documents. Is that a not correct statement in your brief? That is correct, Your Honor, and I apologize for that. What did you do to correct that error before the court, after it was pointed out to you? What did you do to acknowledge and correct that error so that the court wouldn't all be going to look at the evidence to see, if you knew that that was not true, did you file a 28-J and say, my brief is wrong on this, and so please disregard that argument? Did you do anything? No, Your Honor, we did not, and we apologize for that. We really, after the reply was even filed, we did not. You didn't? You had the reply brief still. Yes, Your Honor. You could have put a footnote in the reply brief that says, please disregard that argument. We've double-checked, and that's incorrect. Yes, Your Honor, and I do agree with you about that, and I apologize. It was an oversight. There were two different forms. One was signed. One was not signed in the EEOC file, and the one that we came across, there were over 3,000 different pages. The one we came across was the one that was not signed, and we should have addressed that in the reply brief, and I do apologize to the court. Maybe you should address why that claim, if you believe it's meritorious, is meritorious, because it appears that that argument about a hostile environment is not made in the charge. Well, sure, Your Honor, I can address that. This is for the Clemmer, Chen, and Hill. The big issue in that case, Your Honor, is whether or not their intake questionnaire qualifies as a charge to get within the 300 days to be marked as timely, and we contend that it does. Holowecki holds that a charge can be any document, as long as you are asking for help on the matter, I guess, is what you need to do. And in this matter, on the intake questionnaire for Chen and for Ms. Clemmer, at the very bottom, it states, we acknowledge that this is a charge, and we will comply with you. We will give you our phone number, our address. We will update you, and if we do not, then you have the right to dismiss this. Immediately, they were generated a charge number for all three of them, for Ms. Hill, for Ms. Clemmer, and for Ms. Chen. They all considered it a charge. The EEOC did. Mr. Munoz, in Clemmer's case, sent a letter to Irving ISD stating that basically they were overworked and understaffed, and that was the reason why they were not able to comply within the 10-day deadline to get that charge over to Irving ISD. So they did consider it a charge, both the intake questionnaire for Ms. Chen, Ms. Clemmer, and Ms. Hill, which she signed something similar, but it was not the exact same intake questionnaire. And Holowecki holds that any document, as I said, can be considered a charge as long as you're asking for the agency to assist in this matter. In addition to the questionnaire, all three of them attached 12 related harms, or I guess you considered them a timeline of all the issues that they complained about, to Irving ISD. And because of that, we contend that that meets the timeliness standard. Now, all three of them did eventually sign off on an additional charge that EEOC prepared, and that would be put together with the main charge, which is the intake questionnaire. On this matter, there is an exception to that rule. If you believe that Holowecki does not apply, then you can apply the Price case, which has the relation back theory. And the relation back theory basically states that the document that you signed initially, which could be the intake questionnaire, as long as you have an oath or affirmation on it, and you show who the agreed party is, you show who the agreeing party is, and what you're complaining about, then that can constitute the charge just for timeliness measures. Now, when your other charge is signed, if it falls outside the 300-day period, then that charge would become the main charge piggybacking off the original charge, but it has to have the same related facts or the same related complaints. And so if you do not believe that Holowecki applies, we contend that the Price case kicks in, and all of their complaints basically allege the same facts that their original questionnaire alleges. Now, there's the issue of whether or not Irving ISD did get notice on this matter on Chen and Hill's charge, and we contend that they did have notice of all of the complaints that they had due to the fact that this was extensively, I guess you could say, deliberated and investigated within the district level. There was an investigation conducted by Ms. Madison. There was a nine-hour testimony given by all three plaintiffs in this matter to Ms. Stearns-Miller, and Irving ISD, in drafting the response to Ms. Clemmer's charge, essentially used all the same documents, all the same language in the response to the charge for Ms. Chen and Ms. Hill. So there was no surprise here. They knew exactly what this case was about. It had been going on since February of 2012, and that is why there is no prejudice, there's no unfairness in this matter to what their allegations were going to be. And we cite the case law on that, that we should not be, this matter should not be dismissed outright by the district court because of the fact that we had no control over whether or not the EEOC was going to investigate or comply with any of the provisions set out by statute. And that would be the EEOC v. Air Guide Corporation case. And so that, in our mind, established the fact that their charges were indeed timely, and that they did cover all the claims regarding hostile work environment, retaliation, discrimination, because of the fact that it would include the charge along with the intake questionnaire. Do the intake questionnaires contain any statement or any language that can be construed as a request for the agency to take remedial action? Yes, Your Honor. Where? At the bottom of the page where they sign off on it, and we point this out to the district court, the intake questionnaire that both Ms. Chen and Ms. Klemmer signed says, I am aware that this charge will also be filed with both the EEOC and state or local agency. I will accept my responsibility to advise the agency if I change my address, phone number, or employment status, and I will cooperate fully with them in the processing of my charge in accordance with their procedures. I'm sorry. The question was, does it contain any request for remedial action? I don't believe that that statement you just read contains any request for remedial action. I'm sorry. I'm reading this. But I don't, but I've read it here before today. Where did you request, did your client request remedial action in the, you know, that's a, it's an exception to allow the intake questionnaire. And so it's a, you have to at least comply with the terms for the exception. Well, the Holoweki case, it's not necessarily the exception. It has to request for the agency for it to take remedial action, but for them to ask them to investigate the matter and to help them out in the matter and all the complaints that they have towards the aggrieved party, that is them asking for remedial action. They're asking for them. To do what? To investigate the matter and to help them out with everything that they complained about, which is why they list all of their harms. They list all the parties that they're complaining about, how they were harmed, and I mean, that's. Okay. Counsel, the district court dismissed Clemmer's Title VII claim of a hostile work environment for failure to exhaust her administrative remedies. Do you contend that that was an error by the district court? We do, Your Honor. We do because of the fact, it goes back to the fact that in her intake questionnaire, she does cover the hostile work environment. She lists, I mean, at least eight different harms and how she experienced a hostile work environment, how she was harmed, what those issues were. She does mention it in her charge that was drafted by EEOC, although it's not, it doesn't go into full detail. It does mention that she experienced a hostile work environment. But when you have that charge coupled with the intake questionnaire and all of the harms that she listed, then you get a clearer picture of what those complaints were regarding the hostile work environment. She had no control over actually drafting of the charge. That charge is drafted by EEOC, and that is what she signed off on. But you can consider, Holowecki allows you to consider not just the charge, but any other documents related to that charge. Is there anything else that would indicate that she did not fail to exhaust her administrative remedy on that claim? Not in our mind, Your Honor, no. I'm sorry, what? No, Your Honor, we do not believe that there's anything that she… So you're relying just on her charge for your claim that it was error? Her charge and the intake questionnaire, which we consider a charge based on Holowecki because of the fact that if you read through all the harms, Your Honor, and we list them in the brief, what she complained about, it does cover a hostile work environment. And there are, most of them are there. I believe that we actually laid out the harms themselves, what she complained about, and the hostile work environment is covered in there. And it also goes to the fact that anything that can stem from that charge, which once again is the charge and the intake questionnaire, anything else that you… that can come out of those facts or that you complain about, you can actually complain about in the complaint as well. You have to look outside the four corners of the document. It's not… the hostile work environment is nothing new, nothing different that she'd been complaining about. She complained about the hostile work environment. She complained about retaliation and discrimination. And, I mean, that is all in there. Do you concede if we looked at the four corners of the charge, there's not actually a complaint of hostile work environment? I'm sorry, Your Honor, you can look outside the four corners. But if we were to look at the four corners of the charge, do you concede that that would not be enough? Well, not in Plummer's case, Your Honor.  She mentions it, but she's not complaining of that. She's complaining about a loss of promotion, which is retaliation. And then at the end, she summarizes what her claims are, race, faith, color, national origin, and retaliation. And she never puts… she says that because she previously complained about hostile work environment, she was denied, and also because of her race, that she was denied a promotion. That's what this charge is about, not about a hostile work environment. I mean, if so, is there something I'm missing in the charge? Well, I mean, I know that her charge, if you're just going off the charge itself that was drafted by the EEOC that she signed off on after the intake questionnaire, it does mention hostile work environment. But is mention good enough under the case law? Well, we contend, yes, Your Honor. What case says that? If you say the words at some point, that's good enough to put people on notice that you're also bringing a claim in that. Well, they were on notice of everything that she complained about because we're not just… we contend that it's not just the charge itself. It goes back to the intake questionnaire as well, which is what Howell-Wecky is all about. It doesn't just hold you to the charge. Most EEOC… And what do you maintain the intake questionnaire says in connection with hostile work environment? What do you say it says? Well, I don't have the whole thing in front of me, Your Honor, but it does address the hostile work environment. I mean, she does address that and the harms that she felt. Because the charge states that after complaining of racial bias in a hostile work environment. So she says she was retaliated against because she complained of a hostile work environment. That's not the same as saying I'm lodging a complaint about a hostile work environment. You'll agree with me on that, won't you? Could you… I'm sorry, could you say that again? She says she was retaliated against for complaining of a hostile work environment. That is not the same as saying I'm bringing a charge or a complaint alleging a hostile work environment. Well, and with all… That's different, isn't it? She's saying I was retaliated against because of a complaint of a hostile work environment. With all due respect, I disagree, Your Honor. She contends that there was a hostile work environment. Whether or not she was retaliated against because of complaining about it or not, just the fact that she endured a hostile work environment is what this whole case was about for most of them. It was the hostile work environment coupled with the blatant discrimination that they experienced. That is what this is all about. Well, she wouldn't have to prove that there was a hostile work environment in order to prove a claim that she was retaliated against because of a complaint about a hostile work environment. Do you agree with me on that? I do agree. Yes, Your Honor, I do agree with you on that. Yes. I mean, the fact that it was in the charge itself, we contend that she did preserve the hostile work environment claim because it goes back to the fact that it was coupled with the intake questionnaire that she filled out initially, which is what… that's when they started this whole process. That's when they issued the charge number. Before the charge was even drafted, Mr. Munoz, Ms. Klemmer's investigator, wrote that letter based off the intake questionnaire, and he told Irving, this is the charge that was filed. You know, there was a charge that was filed. We weren't able to comply with you for these reasons. I mean, from the very get-go, they considered her intake questionnaire a charge. But if you look at the intake questionnaire, because I do have the intake questionnaire up here, the program director of special education, Ms. Lusty, and assistant superintendent of human resources, Ms. Chapman, refused to reassign me to another campus after I reported that the principal, Desiree Marks Arias, was creating a hostile work environment and asked that I be moved to another campus to have a conducive workplace. That is not a hostile work environment claim. I'm being retaliated against for having made a previous hostile work environment. Is there something else on this document that you want to point me to? Your Honor, she had multiple pages. Because of the way that the form itself was, she kept refilling out the form over and over, and I think there's three spots, if I recall correctly, for what the harm was. She filled it out over and over again, and she went through all of her harms. And I apologize, but I did not print out her entire complaint. But we could, I mean, I guess we could look at what... You do have Molly Lusty, program director of special ed, gave Ms. Desiree Marks Arias, former principal, etc., a false statement that I said Ms. Marks Arias was out to get me. Ms. Arias called me into her office and told me this. Ms. Lusty facilitated a hostile work environment between me and the principal. Ms. Arias went on for a long time not speaking to me, creating a hostile work environment. That which you perhaps are relying on. I want to be fair to you and give the whole, every reference. That's another reference. Yes, Your Honor, and that would be another reference. And that is why we're saying you can't just go off the language that the EEOC prepared for the charge itself that she signed off on after the intake questionnaire. You have to look at all of the documents together. And this is the main holding of Holowecki is they say you have to look at everything combined. You can't just go off the charge itself. And I guess that's when I ask you a few questions back. What else would you have me look at? What else would substantiate your claim that she exhausted her administrative remedy on the allegation that she, that there was a hostile work environment? Her entire intake questionnaire is what we would ask. This is just for Clemmer alone, but it does maintain with the other ones, with Ms. Chen and Ms. Hill. We would ask that you look at the intake questionnaire. They all filed it sort of differently. Ms. Chen filed her intake questionnaire. All right, but as regards to Clemmer, you want me to look at her intake questionnaire? Anything else? Well, and then the charge itself, obviously. And the charge itself. Yes, Your Honor. That's it. Well, those would be the only things, yes, for whether or not she exhausted her administrative remedies in regards to EEOC. Yes, that would be it. And if you did determine that, yes, she did exhaust her administrative remedies in that respect, then we would ask, obviously, for the lower court to look at the transcript, all the testimony given. I mean, there is a lot of testimony given on this matter. There were a lot of investigations done on this matter. And the whole point of the EEOC process is to try to resolve this issue. It had never been resolved. The EEOC was the last step for them, basically. They had gone through this process time and time again. I mean, they had two what's called a DIA investigations. I mean, they hired an outside consultant to conduct an investigation. They hired for the grievance someone to hear testimony, which they gave nine hours of testimony on all of the discrimination, hostile working environment. It's a very comprehensive file. All the testimony they gave discusses the same thing over and over and over again, which is why the attorney at the time for local counsel, Mr. Boyle, for Irving ISD, essentially wrote the same response for all three of them to EEOC. It contained all of the same documents because of the fact that they were on notice what these women were complaining about. Counsel, I think we have your argument. Thank you, Your Honor. Meet the judge. May it please the court. Tom Brandt for Irving ISD. With regard to the notice issue and in answer to your earlier question, Judge Grace, about the what is it that they're depending on, I think the answer towards the end was they are depending on the notice of the charge, the intake questionnaire, and you heard at the end the administrative proceedings that occurred prior. So I'd like to address that and put that to bed. First of all, the administrative proceedings that occurred prior legally cannot get them where they want to go because there were proceedings, informal proceedings before Ms. Chapman. There was a Level 1, 2, and 3 grievance proceeding. The Level 1 was before Ms. Madison, an outside investigator. Level 2 was before Camille Stearns Miller, an attorney who came in from the outside to investigate. And Level 3 was before the school board itself. That's what the counsel officer was referring to when she talked about Attorney Boyle and the same thing, that they had all these same answers. That doesn't matter at all. The fact that we have this grievance procedure that tries to resolve situations like this should not be in any way, either factually, legally, or in equity, used against Irving ISD as notice because in the EEOC proceedings, what happens is the charge gives you notice. It's only the exception that you can go to the intake questionnaire, but there's no exception that says you can go to anything outside of that. So that's gone. It also has been waived because it wasn't brought up to the district court. But let's deal with the intake questionnaire issue itself. That, we were never given notice. Irving ISD was never given notice of that. It did not contain a request about action. It was not signed. As in Holowecki, there was an affidavit. And most importantly of all, it was not given notice to us. So Irving ISD was given a charge from the EEOC, but we were not given a charge plus an intake questionnaire to look at and consider. When did you get the intake? Through discovery. Yeah, that's right, Ron. Yes, and so when the argument comes opposite to us and says, okay, they say, what about all this in the summary judgment proceeding? What about all this intake questionnaire? We say, wait a minute. How can that be used against us? And the district court did the right thing. It followed the law and said, no, no, no. That intake questionnaire doesn't qualify. Now then, in reference to what the district court did do in Mr. Klimmer's hostile work environment claim, even if you buy the argument that Judge Elrod supplied to the plaintiffs about these are what's in the intake questionnaire, okay, what Judge Fitzwar did was five different things. He did an extremely detailed investigation into, number one, the language of the EEOC charge, which I believe you heard was conceded that it didn't. Well, maybe she didn't concede that fully, but I think it didn't contain the argument that there was actually a hostile work environment that she was complaining about, all right? Perhaps that wasn't a concession, but I think it's true that there was not an allegation of that in the charge. The second thing that Judge Fitzwater looked at is the lack of facts contained in the charge regarding the hostile work environment. So regardless of the fact that the intake questionnaire may have had some language about problems that she was having with Mark Zarias, her supervisor, which was really just somebody having a problem with their boss, not agreeing with them and having words. It wasn't an ongoing hostile work environment, but nevertheless, even if you concede that that was enough, it wasn't something that was described in the charge in any factual manner. There's nothing there. The intake questionnaire says, well, the person didn't talk to them. I don't think that's a hostile work environment under any— No. I mean, isn't that what it says? No, it's like— The person didn't talk to them, and that's not a hostile work environment. That's right. If I frown at someone and I'm their boss, I am not creating a hostile work environment. I mean, that's essentially what the case law says. You're right, Your Honor. Now, the third thing, he looks at the dates listed in the charge, and then he looks at the dates listed in the complaint, and he makes—it's all in his opinion there, so I won't belabor that, but he does say, wait a minute, when you look at the dates listed in the charge, this is not a continuing action. It's discrete. It's saying this date. And then he said, and by the way, she resigned on this date. How in the world can she be having a hostile work environment after she's resigned? Because that's what the charge implies by the dates listed there. So it becomes irrational, and that's what the judge was saying. This is not—this doesn't make sense that you would have these dates claiming a hostile work environment when she's already resigned. Can you look at the two months, the May to the July? There was a period of time. But that's not the time period when the alleged hostile work environment was even going on, is it? That's exactly right, and that's the next thing that Judge Fitzwater said. He said, look, what she's really complaining about is this 2009 period of time to 2000, I think, 10 or 11, which was 300 days prior, at least 300 days prior to the date of the charge, so that can't possibly—they can't get there from here. And then also the fifth thing that Judge Fitzwater looked at was the apparent— what he called the apparent concession by the plaintiffs, at least at the district court level, that the EEOC charge did not suffice, that it didn't put them on notice. Because when we pointed out to the district court that the EEOC charge didn't put us on notice of the hostile work environment claim, their response was to jump to the intake questionnaire immediately. It wasn't to say, oh, yes, it does. So we think they've weighed that question, and they've now tried to bring it up to this court. But in front of Judge Fitzwater, he considered it to have been conceded or apparently conceded. Now, the first issue that was brought up by Ms. Jones in her argument presentation was the failure to promote claim for Ms. Clemmer. And what we did there, and as with all of these claims, there's basically— there are basically two large categories of claims for all three plaintiffs. There's about 18 claims total because there's three plaintiffs. They have about six claims each. There are constitutional claims, and then there are Title VII claims. The constitutional claims are very easy because there's no policy, custom, or practice. They just go away. All of the Title VII claims are all analyzed under four points, timing, scope, prima facie case, and legitimate nondiscriminatory reason slash pretext, burden shifting, McDonnell-Douglas, and all that. So we spent a lot of time talking about the timing and the scope here. But with regard to Ms. Clemmer's failure to promote claim, that gets into the latter part of the Title IX McDonnell-Douglas analysis. They've gotten—presuming they get past the timing and the scope, let's go to legitimate nondiscriminatory reason. So what we had with Ms. Clemmer's failure to promote claim was that she said, I didn't get the assistant principal job that I wanted, I didn't get the principal job that I wanted, and I didn't get the special ed coordinator job that I wanted, or special ed position I wanted. Okay, so I ask her in her deposition, all right, who got the assistant principal position? I don't know. Who got the principal position? I don't know. Who got the special ed position? Ms. Weissman. Joanne Weissman. Okay? All right, so the first two I don't knows become a no evidence issue. They have a prima facie case to say that she wanted a promotion and it was given to someone outside of her protected class. So she has no evidence that the assistant principal position and the principal position was denied to her such that she would supply the necessary prima facie case. So then all we're left with is the Joanne Weissman got the job I wanted as special ed coordinator. All right? So I ask her those questions on her deposition. Okay, let's look at Ms. Weissman's qualifications. She's more qualified than you, right? And we go down the list. She said yes, yes, yes. She's more qualified. And then I ask her, don't you think it's reasonable to give the position to someone more qualified? She says yes. That's the evidence that we put in front of the district court on the failures to promote claim. So we say she's more qualified than you. Yes, yes, yes. She's out of your protected class. She's white. You're black. Okay. You've got the prima facie case. But when we say our legitimate non-discriminatory reason is because she's better qualified. But, Mr. Prentice, this isn't even argued to us. What's that? This isn't even in the brief, is it? Yes, it is. No, I'm talking about the plaintiff's brief, about the promotion. Well, there's a lot of stuff that's missing, but I just wanted to give you the full. It's in the record. Whether it's in the brief. Right, but if you argue that it was waived because it wasn't briefed. But I don't want you to think that I'm somehow hiding behind that and saying, well, no, I'm not. Yes, I'm not waiving the fact that they've waived something. So I don't want to belabor this. The court's not trying to at all imply that you've waived anything. I don't believe opposing counsel is arguing that. That's fine, Your Honor, and I don't want to belabor any of this, and I don't need to take up the court's time. But I do want to make the court aware that even if they haven't waived at that point, when you look at the record, you're going to see that justice was done. That Judge Fitzwater actually did look at the facts and the evidence and the concessions that Ms. Clemer made. And I think with regard to the remaining claims, I would just say this is a somewhat confusing case, but it's just because there are so many. Because it's three cases balled into one. That's really only why it's complicated at all. It really just boils down to policy custom practice gets rid of the constitutional claims and timing, scope, prima facie case, and legitimate non-discriminatory actions take care of the Title VII claims, and that's it. I would yield the rest of my time unless the court has any questions. Thank you. We have your argument. I wanted to address one of the things that Mr. Brandt had mentioned. He mentioned that we have no 1983 case because of the fact that there was no policy that was violated. And obviously we disagree with that. All three plaintiffs gave testimony, and it was presented to the lower court, and we argued it in this matter as well, that there was an unspoken policy of discrimination within Irving ISD. And that is what the whole 1983 case is about. And so we definitely disagree with that. All of them, as I just said, gave testimony to that, that there's policies of being blackballed. There's policies of discrimination and not hiring black people and having the policy of always having to interview a black person just to say that they interviewed them. We mentioned Ms. Klemmer testified that there's, you know, the black was always the token black. All of that is in there. So even though they have that policy, the anti-discrimination policy, Ms. Klemmer testified, and this was presented to the court, that it's just a policy. It's boilerplate language set out by TASB, which is the Texas Association of School Board. Just because you have that policy doesn't mean that you don't have the unwritten policy of discrimination. And all of their testimony is consistent on that matter. And just once again, we do want to point out, we contend that we did address the failure to promote in the brief. It is set forth not under an actual passage, but it is set forth through facts throughout the brief itself. And the lower court ruled that it's not just that she has to prove who got the job. It could be she has to prove who got the job was from a different race or that she did not get the job because she was black. And that is why throughout our brief in front of this court, we mentioned first the comment that the leadership committee told her about the fact that you are interviewed as a black person, but you're never going to get the job. Then we go into all of the other cases that she did apply for the jobs, leading up to the last assistant principal job. She doesn't know who got the job, but she maintains that she did not get the job because she was black. And we did state that in the brief in front of this court. How do we know whether the person was more qualified or not, if we don't even know who the person is? Well, that's not exactly the requirement, Your Honor, under the McDonnell Douglas case that Judge Fitzwater addressed. It's either that she has to prove that the other person was from a different— For the fourth element, she has to prove that the person was from a different race or that she did not get the job. But you don't have either. You don't know who it is. Well, we're talking about for the assistant principal job. The fourth element, the reason it was dismissed, is because they did not prove the fourth element, which was that she did not state who got the job. That's not what the case states. That's not what Judge Fitzwater cited. The fourth element states you have to say who else got the job was from a different race or that you did not get the job because you were black. She maintains she did not get the job because she was black for all of these other reasons stated. She laid the pattern from the very beginning quote of a leadership person all the way through all the jobs that she's gone through, where every time she interviews, the person interviewing who is Caucasian gets the job. Now, as for the Joanne Weissman job, she gave extensive testimony to the lower court. It was all in her brief to them and to you that Ms. Weissman was given the job prior to even having everyone else interviewed on the candidate profile sheet that was provided as part of the record. It says after Ms. Weissman's interview, the candidate profile was updated immediately with five stars that she was recommended for the job. This occurred prior to Ms. Clemmer or any other person ever being interviewed. But wasn't she more qualified according to your own client? Your Honor, we don't agree with that's what Ms. Clemmer stated. Ms. Clemmer stated in testimony that she was a speech pathologist and she did not have the criteria to be the dean of instruction for the special services. That is what Ms. Clemmer testified to, and both towards Ms. Stearns-Miller and within her deposition. She never necessarily said that Ms. Weissman was more qualified. She said Ms. Weissman got the job because she's friends with Ms. Lusty and because she is a Caucasian lady. That is Ms. Clemmer's testimony. That is what is in her deposition. So if we read the deposition, it will not say that she acknowledged on cross-examination that the other person has certain qualifications and that she lacks those qualifications. From my recollection, Your Honor, no, that is not my recollection of her testimony. Her testimony, from what I recall, is that Molly Lusty was friends with her. She brought her in from Houston. She was a speech pathologist who did not necessarily have the qualifications to be the dean of instruction, and that she was a white person, and she got the job prior to anyone else being interviewed. How can you say that Ms. Weissman is the most qualified person when you haven't even interviewed the other people? Can you tell on paper maybe she has certain degrees or she's had certain experience on a resume? I mean, isn't that—there are certain cases where you can. Don't you concede that if you do this employment law? Your Honor, I do concede that. If they truly felt that, then yes. But once again, they awarded her the job prior to even interviewing anyone else, and it was because of the fact that she was a white friend of Ms. Lusty's. That is what we contend. Okay. Thank you, Your Honor. Thank you. We have your argument.